<u>IN THE FEDERAL COURT FOR THE EASTERN DISTRICT OF TENNESSEE</u>

| | | |
|---|---|---|
| **Thomas Ryan** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No.    **3:21-CV-00291-KAC-HBG** |
| | ) | **Jury Demanded** |
| **The Tennessee Valley Authority and** | ) | |
| **Jacobs Engineering Group, Inc.** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

### THIRD AMENDED COMPLAINT

---

Come now Plaintiff, by and through counsel, pursuant to Fed. Rule of Civ. Proc. 15 to

hereby Amend his original Complaint as a matter of course and right for personal injuries from

toxic fly ash exposure.  Plaintiffs allege based upon personal knowledge, information and belief

as to the reckless acts as follows:

1.      This is a civil action for personal injury, trespass, nuisance, property damage, and

reckless/intentional interference with Plaintiff's healthcare providers, carriers, mortgage lender

and other entities due to the pollution of his property and his contraction of illnesses resulting

from continuous unlawful exposure to arsenic, the neurotoxin mercury, barium, strontium,

thallium, lead, silica-quartz, asbestos, radioactive material, selenium, aluminum oxide, iron oxide,

calcium oxide, boron, and other hazardous substances associated with toxic fly ash.  Plaintiff's

residence is directly across (within mere feet) across from the Kingston Fossil Plant in Harriman,

Tennessee. The site had been formerly designated as a hazardous waste remediation site due to its

combination of numerous toxic elements and materials from an ash spill at the KIF facility where

a massive dishonest public relations scheme began.  However, the remediation was never truly

completed as will be further demonstrated. The toxic ash still migrates onto his property as to the date of filing of this Complaint.

2.      At all times material hereto and prior,  TVA has dishonestly conveyed to the public that its radioactive enriched toxic coal ash is merely "dust" in order to gain extravagant profit for high level executives.

3.      Jacobs Engineering Group, Inc. (hereinafter sometimes referred to as "Jacobs") was the sitewide remediation contractor in charge of cleaning up the spill and currently participates in ash safety, transport, and refinement, handling, and etc.

4.      During 2008 the toxic ash spill site spewed large amounts of toxins that necessitated remediation.  The extent of the site clean up work was much more extensive at the time than compared to what it is today.

5.      This health nuisance still exists with smaller amounts of unhealthy radioactive toxic migration onto the property of the Plaintiff, and others similarly situated that is ongoing in nature and is intrusive.  This intrusive toxic migration is primarily airborne, but also from water that in part resulted from negligent remediation work that was a substandard radioactive threat that has/and is  still occurring during and after the Kingston ash spill, and thereafter.  The Defendants at all times did not carry out validly conferred authority and recklessly did not execute the will (purpose) of any governmental function.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction over this action under both 28 U.S.C. §§ 1331 and 1337  as a civil action arising under an Act of Congress regulating commerce, namely the Tennessee Valley Authority Act of 1933 ("TVA Act"), as amended, 16 U.S.C. §§ 831 et seq.

7.     Defendant, the Tennessee Valley Authority, or TVA, is a wholly owned federal corporation which, under the TVA Act, 16 U.S.C.§ 831, may "sue and be sued" in its corporate name.

8.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because (a) Defendant TVA's  principal place of business is located in Knoxville, Tennessee, and thus it resides in this judicial district, (b) the events or omissions giving rise to the claims in this action occurred in or near Kingston, Tennessee which is in this judicial district, and (c) all the properties involved in this matter reside in this district.

9.     All actions complained of herein arose in Roane County, Tennessee where the toxic cleanup and Plaintiffs' exposure occurred.  This case  involves  matters of suing a corporation created by Congress pursuant to 16 U.S.C. Sec. 831 that may appropriately be sued in this Court under 28 U.S.C. 1330 et. Seq.  Jacobs Engineering Group is a foreign 20 Billion dollar diverse corporation sued in this action in an amount over seventy five thousand dollars. This matter also involves questions of federal laws, orders, rulings, and regulations.  Therefore, this Court has and/is the most convenient venue for adjudication of this matter and has jurisdiction over the claims.

### THE PARTIES

10.     Plaintiff Thomas Ryan resides at 1007 Swan Pond Rd., Harriman, TN 37748 directly across from and very close to the Kingston Fossil Plant (Hereinafter referred to as KIF).

11.     A request for Waiver of Service, along with the Verified Letter of Response, and Notice of Rights pursuant to Federal Rules of Civil Procedures 4 have been submitted to counsel for both Defendants.

12.     Defendant Jacobs Engineering Group, Inc. (hereinafter "Jacobs") is a foreign

corporation with its principal place of business in Pasadena, California. Jacobs Engineering Group, Inc. was licensed to do business, and is doing business, in the State of Tennessee, Roane County. Jacobs may be served through its Registered Agent for Process, CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.

13.     TVA is located at 500 W. Summit Dr.,  Knoxville , TN 37902 and may be served with process through General Counsel David Fountain at this location.  TVA may be sued in its corporate capacity pursuant to 16 U.S.C. Sec. 831.

## GENERAL ALLEGATIONS

14.     The events described herein took place primarily surrounding the TVA KIF Superfund cleanup site in Kingston, Roane County, Tennessee.  Jacobs was contracted as the "site wide safety contractor".  Jacobs and TVA, pursuant to Administrative Order, were to have provided a safe environment for all nearby residents near the KIF spill remediation site, and Jacobs still is associated with sitewide safety at that location.

15.     TVA has a policy that mandates that the TVA and its business partners always take the most restrictive safety measures in order to protect human health.

16.     The Defendants' were legally bound to comply with all laws, regulations, administrative rules, and court orders.  The Defendants did not adhere to this obligation and in turn disrespected their obligation to the ratepayers in the Tennessee valley.

17.     At all times material herein, both Defendants intentionally or recklessly deviated from the scope of their legal duties.  Further, individuals at the KIF remediation site and adjoining landowners were dependent upon the Defendants acting in good faith to protect their health, but they did not.

18.     As a result of the prior ash spill causing financial exposure and image problems,

the Defendant, TVA, engaged in a massive PR scheme to deceive the public regarding the safety of the toxic fly ash, including the Plaintiff. This was motivated, in whole or in part, to preserve extravagant managerial compensation. From the outset of the hazardous spill clean up, the remediation workers (unbeknownst to them) were to be used as secret marketers to the public to convey that the toxic coal ash was safe.

19.    TVA knew this was not only a reckless human health risk that was misleading, but was primarily done to induce the public to refrain from taking legal action. By doing so, it allowed the Defendants to avoid increased safety costs, prevent remediation delays, avoid enormous EPA fines related thereto, and to gain millions of dollars in bonuses. TVA also sold the ash that the public thought was a huge ratepayer liability due to necessary remediation, containment and handling processes. Instead, for investor financial filings, it was considered a regulatory asset.

20.    This deceptive scheme was verified through internal emails from the outset of the project by the Defendants that stated a primary aspect of remediation is creating a false perception that the radioactive coal ash was safe.

21.    For example, via a 2010 email, one of Jacob's lead safety managers said *that the workers were the visible ambassadors or conduits used to convey the false message to the public that the radioactive coal fired ash was safe*.

22.    Commensurate with this objective, the Defendants committed the following acts of deception or otherwise to deceive the Tennessee public into thinking their radioactive toxic metal laden substance of fly ash is merely safe "dust". *TVA makes approximately one hundred million dollars for the sale of its "dust". The Defendants' have repeatedly stated for the past decade their toxic fly ash is not hazardous to health, but is instead harmless "dust".*

23.     Many of these fraudulent deceptive acts are ongoing in order to make egregious private profit from this "*dust*" through seeking approximately 100 million dollars per year.  These egregious deceptive acts motivated to support extravagant executive spending contrary to the interest of the ratepayers.  These deceptive acts include, but are not limited to, the following stated in the foregoing.

24.     Contrary to TVA's false message of safety, when coal ash is burned, unbeknownst to the public, the natural radiation in the coal is enriched to the extent that it is extremely hazardous to a lethal extent.  The Defendants concealed that and never made it public, because they would lose millions of dollars in fines for not being able to remediate, or sell its refined constituents (heavy metals) on the world market that result in approximately $100,000,000.00 per year for the TVA.

25.     In 2009, TVA established a Kingston Recovery website.  The site fraudulently contained doctored photographs of the site reflecting green grass, healthy trees, and CEO Tom Kilgore's  misleading Congressional Testimony.

26.     In Jan. 2009, *TVA lied to the public about the radioactive nature of the fly ash by repeatedly stating " it was less radioactive than table salt"*.

27.     In Jan. 2009, TVA then represented to Congress that the ash from the spill "was not radioactive". TVA lied to Congress.

28.     In TVA's own extensive report regarding its toxins that was deceptively submitted to the governing body contained hidden language buried in the middle of this extensive report a small unrecognizable sentence.  The sentence states that *radio nuclides were not even tested for nor analyzed.  This manipulative inaccuracy was done in order to avoid true Congressional accountability regarding this poisonous substance.*

29.     This radioactive secret was again further proven when the Kingston ash was later shipped to Uniontown, AL and it was discovered the "ash" was beyond acceptable state regulatory limits . The radioactive levels that were dangerous to humans.

30.     In February 2009, TVA was instructed by the EPA that the site workers were to wear full TIVEK and be given respirators due to the hazards associated with these radioactive toxic substances.  This request by the EPA was vehemently argued against by the Defendants because it would create public perceptions the substance was dangerous and unsafe creating liability exposure.  Further, true public knowledge would delay the project, and in turn cause incredible financial loss, and in turn bonuses.

31.     Further, during that time frame, they also decided not to offer to perform medical surveillance and prescreen physicals as recommended by law.  This decision was based upon being able to obscur the ability of a correlative diagnosis of 'worker and public health problems. If people thought they could not be hurt from the toxic ash then they would not think to relay information to doctors of the potential cause for a plethora of health problems it can cause, including death.

32.     This deception prevented medical intervention and caused death.

33.     In February of 2009 an anonymous complaint from an individual that had access to planning documents for safety filed a complaint with OSHA stating that workers on the site were exposed to high levels of radioactive material.

34.     TVA  replied to OSHA saying that employees are not being "overexposed" to radiation, and they are taking steps to control the dust.  However, according to internal emails the radioactive toxic "dust" could not be controlled and unbeknownst to the public it could be lethal with simply a dosage of 1mm for a regular period of time according to emails by health and safety

agents disseminated in 2000.

35.     *ORAU was selected to do health studies regarding the ash spill in April of 2009.*
*TVA manipulated a health study that was being performed by ORAU.*

36.     In 2009, *TVA instructed ORAU not to test for radiation as it was not necessary*
*despite their knowledge the fly ash was harmful and radioactive.*

37.     This omission of testing for radioactive contact created an inaccurate testing
protocol for all the potential health problems related to fly ash.

38.     Moreover, TVA controlled the website providing necessary information to the
public in order to even get the health health evaluation from ORAU.  For approximately six
months, the website was not even working.  Further, the process was designed to be exclusionary.
By using the internet as the primary means to obtain physicals and testing further purposeful
exclusion occurred.  Many eldery and others close to the site at that time did not have broadband
internet access. This created a smaller pool for medical and scientific comparison.

39.     These  results provided to ORAU were manipulated by TVA through their
concealment.  The incomplete testing results, though no fault of ORAU, were then submitted to
the Tennessee Department of Health for review, analysis, and publication for public reliance.

40.     Due to the methodology of sampling that was secretly manipulated and flawed, the
results disseminated to the public were flawed.

41.     During 2009 through 2016, the Defendants altered, manipulated air monitoring
process results, testing, and destroyed records that reflected higher amounts of toxins beyond
permissible exposure levels than they reported.  The true accurate radiation readings were not
reported to the EPA, TDEC, and the public.  During this time frame the Plaintiff and the Public
were relying on accurate information to be disseminated pursuant to the Emergency Planning "

8

Community Right to Know" Act.

42.     During this period, until present TVA did not thoroughly monitor for radiation. Not surprisingly, testing from a recipient site referenced in Alabama revealed it was extremely hazardous to human health beyond normal regulatory limits previously referenced.

43.     In 2009 TVA also began and continued to submit digitally enhanced photographs to lawsuits to create a false impression of safety regarding areas near the site.

44.     *Upon information and belief, TVA participated in hiding constituents that were tested for in the statewide  health study and concealed a number of constituents to be tested for and analyzed, such as beryllium radioactive material.*

45.     In April 2009 a Jacobs  manager stated that they can not control the radioactive toxic fly ash saying that it results in fly ash migrating into the community at unacceptable levels. The Defendants lied to the public and continued to say it was safe.  This crucial health information remained hidden from Plaintiff and the public at large through present day.

46.     As a result of certain radioactive problems TVA obtained Steve McCraken (a human health radiation specialist) through an employee loan from DOE, based upon his knowledge of the appropriate handling and  containment of radioactive material.  McCracken coincidentally now works with Jacobs Engineering in order to prohibit counsel from communicating with him, which has been a pattern committed by the Defendants' with other employees and witnesses.  (Which will be further discussed later).

47.     The Defendants promised stationary air monitors would be present to protect Roane County from unsafe levels of radioactively enriched coal ash.  However, two years later an email verified only one sample had taken place, despite the promise they would be constantly conducted.  This not only fooled the regulators but the public.

48.     In that same year the EPA allowed the Defendants to test and clean up this hazardous condition, without an onsite regulatory presence.  TVA and Jacobs turned into foxes guarding the hen house.

49.     Despite the EPA warning the Defendants of radioactive hazards of radioactive waste from the K-25 facility being present in Watts Bar at the bottom of the water near KIF. The Defendants allowed the radioactive material to be dredged up and left  to dry in the newly created dike at KIF. This allowed the contaminates to be combined with fly ash from KIF. This enhanced the  radioactivity  of already radioactive material. It also enhanced the risk to public health.

50.     This radioactive material was dredged up that was located in the Watts Bar basin placed in the ash impoundment left to dry, and upon information and belief became airborne. This was not disclosed to the public.

51.     During 2009 to present, TVA has still been having community meetings and averred fly ash is safe.  This practice expanded in geographical territory, and still fraudulently influences public opinion.

52.     In April of 2009 it was reported that unsafe calcium oxide levels were endangering those that worked, transgressed, or lived nearby.  Calcium Oxide is a dangerous toxin that attacks numerous portions of the body.  Ironically, the skin from many exposed, have similar cancerous, fungal, rash, or related skin conditions. This pattern description of many symptoms referenced requires immediate requirement of medical attention if so exposed. This information was fraudulently hidden from the public.

53.     TVA continued to disregard health problems such as this and used Jacobs to prevent medical attention as mandated by law.  Certain  attention requested by victims that were exposed  and were told it was safe, and the needed attention was denied, all to maintain the

"perception" the radioactive toxic fired coal ash was "safe".

54.    During 2009- to present  Jacobs was required by TVA to submit their press releases to TVA for matters regarding the ash for their approval that pertained to the KIF site in furtherance of their false objective.

55.    In May of  2009, via email it was indicated that litigation interest interfered with providing medical screening.  Despite what should be done, if comparative medical baselines existed it would notify people of increased health problems that could be correlated to the ash. This was a grave interference with the communities right to know so they could engage in preventative health care and discovery.

56.    *Further upon information and belief, in 2009 TVA unlawfully convinced a TDEC employee to reduce a high radiological reading in a report by over 90% to fool the general public.*

57.    Continuing in the projection  that the hazardous site and toxic coal ash was safe, in 2010 Jacobs issued a misleading press release stating that there have been millions of hours worked without injury, further creating a false impression of fly ash safety in the Kingston area.

58.    A year later,  through its deceptive acts, Jacobs publicized that on all Jacobs' work sites there were 84 million hours worked without an on the job injury.  This was done to falsely portray ash safety, but to also to obtain undeserved  bonuses, in part,  from the TVA ratepayers. TVA and other companies had contracts with Jacobs that had a bonus structure for extra money that gave Jacobs the monetary incentive to illegally violate the Workers Compensation Laws. This was a particularly false stretch as Jacobs had never performed a toxic fly ash remediation project required by the EPA prior to the TVA awarding its $63,000,000.00 contract with a promise of more $$ in the future if they secretly prioritized the TVA executive structure over ratepayer

health.  They preached safety until it was time to be safe.

59.     For a significant time from 2009-2014,  the remediation process subcontractors dredged up radioactive material, pumped it into the new dike, and secretly stored it improperly. Then work temporarily stopped.  However, the Defendants created a climate that there was nothing to worry about amongst members of the public regarding radiation, much less any other safety issues.

60.     *TVA and Jacob's did not divulge that there were four different kinds of mercury, PCBs, uranium, cesium 137, and beryllium contained in the radioactive coal fired ash among many other lethal contaminates.*

61.     Additionally, the Defendants concealed from the public the toxic constituents referenced in paragraph one.

62.     At the outset of the project that continued at minimum through 2017 , the Defendant's began threatening or terminating the working ambassadors to the public that sought health  protection for breathing, requested to be examined by a physician, or brought in prescriptions from medical specialist that prescribed facial respiratory  protection to keep the fact the toxins were unsafe from citizens who could see the site from public view.

63.     If people close to the site could see the " working public ambassadors"walking around in TIVEK  suits and respirators as instructed by the EPA then people would be extremely concerned about health and safety, and it would become an enormous  instant financial liability when counterbalanced against (bean counted) the correlative long term public health  exposure problem verses immediate cost of medical monitoring  for site workers and those citizens who lived nearby, such as the Plaintiff.

64.     Previously,the EPA, in 2009, also recommended that the people working the

remediation site had to shower and change daily clothing upon leaving because it was so dangerous. This was evidenced by numerous correspondence involving the Defendants. TVA and Jacobs refused to even do this to provide this minimal human protection, because local family's, friends, and relatives would question the safety of the ash if it could not be taken home or present in a household. This was designed to keep the dangers hidden from the public, including Plaintiff.

65.     The above referenced neglectful hazardous disregard for people was deceptively disregarded  even though they knew 1mm or 3.6 grams of the ash ( from their own internal documents) would likely severe health problems, especially in children , the elderly, and someone immunocompromised (i.e. an average diabetic). These and many other communications of this nature were not disseminated to the public.

66.     In  2010 and thereafter, TVA  filed court pleadings that  contained manipulative digitally enhanced photographs that erased visible fly ash on landowner properties in Kingston. These photos  were disingenuously submitted to the Court by TVA even though internal emails on or about the same time the Defendants referencing not being able to control metallic snowflakes migrating onto property owners land and it needed to stop because it was hazardous.

67.     In violation of the Administrative Order  No: CERCLA- 04-2009-3766 that governed remediation matters and health  protection, the Defendants' destroyed destroyed  all video and photographic evidence of the site area conditions in violation of that Order, and other statues in a further attempt to hide from the public the intrusion upon peoples properties and site conditions in order to convince the public it was safe.

68.     During this same time frame Jacobs sitewide safety leader along with other managerial leaders was informing workers on sight that " fly ash was so safe you could eat a pound of it", knowing this would be relayed to the local community in order to make them

13

believe their radioactive toxic goo was safe. People from the cleanup would then travel around the Roane County community and when asked they would say it was safe, as the workers were told " you could eat a pound per day".

69.     The *mantra "a pound a day"* was disseminated in an internal email by Jacob with the instructions to deceptively make workers think it was safe, and in turn the public.

70.     The 2010 email was generated  in order to emphasize that toxic fly ash was safe, because the workers words and appearance would influence the community, as well as Plaintiff.

71.     Due to the working site ambassadors getting more and more sick from incompetent fly ash handling and fraudulent air monitoring, there was an increased request for PPE and medical care by workers on the KIF site. This created a clash of interest with the Defendants desired perception of a safe site and in turn community. If publicly visible respiratory protection was given, the hazardous secret of how unsafe the substance was would be out in the open for public knowledge. As a result in an attempt to squash risk of mass divulgence , the Defendants resorted to acts of threats and intimidation  such as destroying the respiratory equipment inorder induce worker secrecy to prevent the risk of the fly ash being perceived as unsafe by the public, and the Plaintiff. In furtherance of this secrecy scheme, it was long established that if someone wore protective respiratory equipment in public view they would be shown the house or leave the gate never to work again. This once again part of the scheme to fraudulently induce the public it was "safe".

72.     The monetary motive of saving and making money by avoidance of delays, fines, litigation overrode human  life and health. What makes this even more egregious is that TVA began to  make a multimillion dollar profit from selling the fly ash that  was removed from the spill, and today makes approximately one hundred million dollars in sales of the substance.

73. In 2017 Jacobs Engineering pled comparative fault upon the TVA in a related matter. This eliminated the opportunity for the Defendants to claim the Common Defense Doctrine that could insulate them from any claim of privilege of communications between their respective Legal and Public Relations Departments. Moreover, TVA waived any privilege from their OGC improperly attempting to interfere with medical attention that should have been provided to site working public ambassadors through their third party communications with third party ZURICH Ins. Co, and others.

74. According to testimony under oath in 2017 by TVA, the wealthy agency unbeknownst to the layperson made twenty million off the sale of the Fly ash from Kingston in 2010.

75. As the toxic "*dust*" dried , the more airborne it would become and internal emails stated they could not control it. The migration continued upon to peoples properties, including the Plaintiff.

76. Moreover, in on or about 2014 Mr. Tom Bock secretly made a statement to the effect that if people knew what was in the fly ash the site would be shut down. This would further create delay penalties for the Defendants' and lost financial incentive dollars.

77. It was recently discovered through hidden emails that as a result of the above, TVA (through their General Counsel's Office), along with Jacobs Safety managers wrongfully and /or unlawfully began to participate in interfering with worker's right of medical review by a doctor for health complaints that the hidden documents in possession of the Defendants', but not disclosed to the public. They even directed people to deny even a doctor's visit to working ambassadors, all to prevent widespread knowledge of the unsafe dangers and injuries. TVA would further take unreasonably dishonest positions about the health problems by prioritizing

money over health.

78.     This deception continued as approximately 26 workers/ ambassadors went to Jacobs Safety Manager Tom Bock to complain of injury and breathing problems.

79.     TVA was illegally interfering with the workers compensation rights of these individuals that reported these serious problems that worked for subcontractors GUBMK, Sevenson Engineering, Trans Ash, and Civil Projects.

80.     When asked in sworn testimony under oath why the Sitewide Safety Contractor did nothing when such a large number of people complained of injuries and breathing problems Bock responded by stating : **"We are not a pharmacy"**. This inhumane response was made to hide their true goal of secrecy that would be undermined if doctors were allowed to examine them as required by the workers compensation laws.

81.     This obstructive conduct was committed by the Defendants, because if word got out to the public about the situation it would cause delays, create financial penalties, liability risk, lost bonuses.

82.     Based upon the previously referenced motives, a 2013  email  GUBMK through improper influence from TVA, semi-private entity ignored complaints regarding subcontractor GUBMK by encouraging them to not timely process workers compensation claims to once again hide health hazards.

83.     Certain employers were instructed to run workers compensation claims filed with them through the TVA legal department in an attempt to deny claims and prevent the public from knowing its hazards.

84.     Deceptively, Jacobs later issued press releases stating in over 700,000 hours worked at KIF there was not one reportable injury. Then their numbers went to millions. This

concealment misled the public of the severity of complaints of harm regarding exposure to the ash.

85.     TVA represented in court that the condition of the site was better than before in the initial land cases that were tried over property damage. This false message was also constantly perpetuated in the public creating a safety image.

86.     This pattern regularly continued from 2008- present  through the use of  TVA's massive Public Relations Department to mislead the public about the condition of KIF and dangers to the public in Roane County. These representations were relied upon by the Plaintiff and those who live nearby.

87.     The Public Relations Departments of the Defendants were very aggressive from 2008 to present to collusively  hide fly ash dangers from the public.

88.     In both 2015 and 2016 the Defendants falsely announced cleanup was complete for financial gain and once again to fraudulently  favor  image restoration over site remediation.

89.     The area that was stated to be complete was a fake rush job. The media had been alerted  to appear for the final results of the cleanup. Workers worked until 5 a.m.. Certain workers said they needed to move quickly so they could collect their bonuses. Certain workers alerted the onsite managers that the job wasn't complete and they need to be worried about whistleblowers. A small layer of dirt and grass was then completed for the media to witness.

90.     This false announcement of completion  later caused the Defendants to shortly thereafter have to continue to  begin actual completion on the area as leaking of the radioactive toxins was discovered.

91.     As this was occurring, in nearby Anderson County that is an industrial partner with Roane County, the deception of the radioactive  coal fired ash took a more regional strategy.

92.    In 2016 questions regarding toxic ash disposal became a community issue due to the potential future closure of the Bull Run Fossil Plant. TVA began promising that fly ash is safe and telling the Anderson County public to not worry about its storage.

93.    Currently in Anderson County as of August 9, 2021 *TVA is once again saying their radioactive coal fired ash is safe. This is contrary to Duke University, ( with whom TVA has sought guidance from on the issue) is wrong.*

94.    *As a part of the deceptive scheme TVA has continuously tried to overcomplicate a very simple matter with community leaders through overcomplicating the science. TVA and Jacobs use public relations themes such as "naturally occurring in the environment", "trace elements", "it's in your vitamins", when ironically right beside the Bull Run facility a sign that says without explanation "don't eat the fish". TVA does not tell the public the radioactive fly ash will eat your organs as stated in its internal documents.*

95.    *The Defendant's own hidden internal documents say it will attack the immune system, all organs in the body, cause cancer, and potentially kill you.*

96.    *In short - Duke recently said it will kill you. TVA's internal undisclosed documents say it will potentially kill you. People have been exposed to it, and as a result people can and have died from contact with their radioactive toxic misnomered "ash".*

97.    An example of the factual simplicity of " the ash" harming people was when an employee at Bull Run found documents that indicated all TVA "fly ash" caused cancer and a route of exposure was through the eyes.

98.    Regular promises that their coal "ash" was safe were asserted, from 2016 to present, at community meetings at various locations in surrounding counties.

99.    In 2017, the site at KIF began to leak radiation, arsenic, and asbestos into the

ground water into Watts Bar due to the rushed, incompetent remediation work that was overseen by Jacobs. TVA hid this from the public as well as Plaintiff.

100.     In December of 2018 TVA used rate payer money to place an ad in The Roane County News to influence public opinion that the site was safe when it was not, and that Co-Defendant Jacobs did a great job.

101.     Then Jacobs PR Department also went on the offensive shortly after the Verdict they lost involving sick site workers Jacobs and disseminated untruthful press releases to perpetuate their fraudulent scheme.

102.     One press release by Jacobs communicated to the public to get the "facts straight". They then accused the Knoxville News Sentinel of having a reporter that was a de facto member of this drafters legal team, which could not have been anything but further from the truth. However this was another malicious attempt to hide the unsafe nature of the substance, and keep the public from taking legal action to protect themselves and their property.

103.     They attacked the credibility of the local newspaper for publishing the truth , even though all articles were double and triple vetted.

104.     Then Jacobs disseminated a press release entitled " Kingston Fact Check" to yet again deceive the public that an impartial jury wrongfully determined the fly ash can harm virtually all organs in the body that included the following: 1) Jacobs asserted in this press release no one admitted lying in the trial- when problem was they got caught lying. 2) Jacobs stated that none of their employees stated that you can eat a pond of fly ash per day- disproven as they admitted it was said. 3) Respiratory protection was voluntary- disproven as a lie—-employees were fired for it and threatened for it with one Jacobs safety representative on video tape saying to an employee he would lose his job if worn and " *would be hanging himself with his own cock"*.

4) The injuries and illnesses were not caused by their coal ash when hidden internal documents clearly state their radioactive coal ash attacks virtually every organ in the human body. 5) Jacobs has an excuse for "air monitoring cleaning", but the truth was Jacobs got caught lying at that trial about air monitoring accuracy, destruction, absence, and manipulation.

105.     The Defendants publicly tried to insult the jury that actually heard the truth and presided over the facts at trial. However, the public was not able to witness this trial to see the truth like the local jury was. As a result, misleading comments, such as this, by the Defendant's carried greater weight in misleading the public.

106.     In 2019 by the Defendants the Roane County governments sued TVA and Jacobs in order to protect its citizens. Upon filing suit counsel for the governments, their counsel contacted TVA and requested that they not have contact with the governmental clients regarding the subject matter of that litigation as certain rules of ethics require.

107.     TVA's Office of General Counsel sent a message that this request would not be honored. Immediately thereafter TVA improperly invited the Roane County Commission and certain other governmental officials to tour the KIF facility.

108.     However, unbeknownst to the governmental officials TVA engaged in the same scheme of deception. They closed the facility approximately four days before touring, cleaned the premises to alter it's natural existing condition in an effort to create a false portrayal of safe practices. This was regular protocol for every instance in which government officials or VIP's visited virtually all coal fired facilities. This misleading ongoing scheme continued despite the facts referenced in the previous paragraph's ethical obligations, and pending lawsuit.

109.     In the meantime meetings continued in Anderson County where the message that coal ash is safe is TVA's theme.

110. Without contacting counsel for the Roane County Governmental entities, TVA arranged and manipulated the test of a ball field, where kids played. Without a mention to counsel for the local governments, TVA tested the wrong field , but also fought soil sampling for even the wrong location for more than 6 inches deep due to the fear it would be radioactively hot.

111. This concealment scheme continued. *On or about the beginning of October 2019 , it was reported to counsel that 100,0000 tons of asbestos (ACM) was discovered near the top of the remediate land fill directly across from and close to Ladd's Landing* in Kingston, TN.

112. Upon contacting the TVA Office of General Counsel (hereinafter OGC) about the issue , the response from OGC was commensurate with their lack of accurate or pattern of concealment. The Defendant responded by surprisingly stating it was charred wood and trees, despite the fact TVA should know what is in a prior area of mandated remediation by the U.S. Government or that ACM is on their site period. Later in a press release they minimized this very serious health issue.

113. To present day upon information and belief, fly ash, arsenic, radiation and asbestos migrate onto property of the Plaintiff.

114. The meetings in Anderson County still continued and portrayed the coal ash and activities related thereto were safe in purpose of scheme and preemptively attempting to deny the public from taking justified legal action. This false information was and is publicized in both counties, one of which Plaintiff resides.

115. As referenced, meetings continue in Anderson County that affect both counties referenced in the subject matter of this litigation in regards to issues of fraud and communal public health.

116. As stated, Dr. Anver Vangosh tested the area in Bull Run regarding the safety. The

test results rendered the playground next to Bull Run contaminated to the extent it will hurt people's lives and shorten them. Vangosh is the world renowned authority on coal ash. Dr. Vengosh stated the TVA coal ash will shorten lives in the Claxton community from the Bull Run location.

117.    The CEO for TVA that makes over $8,000,0000.00 dollars( eight million +) per year stated that the science is now catching up with the harms, but TVA concealed grams and death, in particular of children, from the exposure to the ash.

118.    Recently Jacobs has been sending threatening indemnity letters to local Roane County companies that are threatening in nature, despite defrauding those subcontractors in a false attempt that they are obligated to pay them when they have not been sued. These attempts to extort money out of the smaller local contractors that the Defendants relied upon the false appearance of the ash being safe, is further unconscionable.

119.    Jacobs conduct has been so outrageous that certain insurance carriers upon investigation have denied insurance coverage for the company on the issue due to the company's conduct , but little if any notification has occurred regarding their investors. This is just another act of concealment, for their board surely would not condone this unconscionable out of their East Tennessee executive conduct.

120.    The previous represents the most extensive of  collusive fraudulent schemes regarding a billion dollar industry and risk management. Favoring money, no matter the amount, over  toxic radioactive metals and human life is never acceptable. Any applicable statutes of limitations should be suspended and tolled for any human being that has fallen victim to this predatory conduct.

121.    Plaintiff Thomas Ryan had worked in no prior hazardous work sites that would

have exposed him to any similar toxins as a result of this predatory conduct.

122. All of the preceding reckless acts, caused the dangerous toxic acts to continuously migrate and trespass onto Plaintiff's property and cause him to be regularly exposed to this lethal substance.

123. In 2020 Mr. Ryan began to experience unusual health problems. He could not figure out what was wrong due to the fact he did not realize the fly ash that migrated onto his property through various routes of exposure was unsafe, as he thought it was safe *"dust"*, as TVA and Jacobs fraudulently marketed.

124. Because of the Defendants fraudulent marketing scheme he was unaware the toxic *"dust"* targeted the human immune system . Moreover, he did not have the opportunity to learn that based on your individual DNA the toxic *"dust"* makes people susceptible to endure different forms of health problems that are numerous in fashion due to the fact that *'dust'* attacks virtually all portions of the human body. The opportunity to take health precautions by him and others was precluded by the Defendants' dishonest fraudulent safe spin on their *'dust' that was toxic.*

125. TVA nor Jacobs ever revealed that their coal ash contained beryllium, hexavalent chromium, arsenic, asbestos,boron,silica,lead, calcium oxide, and about 20 other toxic metals. Moreover, it is radioactive as the radioactive elements are enriched ( increased) when the coal is burned at the Kingston facility, not like anything that occurs in the natural environment. As stated, they mislead and merely say it is safe "dust".

126. Mr. Ryan's health condition gradually got worse. Due to TVA's and Jacobs' dishonest conduct he did not truly realize there was a correlation that the fly ash caused him health problems . He had tested positive for extremely high amounts of cadmium, lead, manganese, iodine, bismuth, gadolinium, antimony, aluminum, arsenic, and overall extremely

high for overall toxic representation,  as seen in exhibit 1 to this complaint. However, he had also fallen prey to the fraudulently induced symptom response confusion created by the Defendants.

127.    Exposure to all of these toxic substances have caused him severe health problems, and has to others similarly situated  as well.

128.    Now, this Plaintiff suffers from the following health problems that include, but are not limited to, blood problems, lung problems, neurological problems, and sinus problems. These are all health problems TVA's And Jacobs internal documents said would likely occur when their fly ash came into contact with people. This, in turn, caused him to have extensive medical expenses, loss of enjoyment of life, aggravation and inconvenience, pain and suffering, and all other expected damages  that flow from such exposure.

129.    The coal ash continues to migrate onto his property and is an improper unhealthy intrusion.

130.    It has rendered his property unmarketable and usable, bordering on an unconstitutional taking.

131.    The Defendants have ignored their legal duties, and failed to disclose all the toxins that they caused to migrate on his property. In so doing, the Defendant's committed a reckless disregard of a concealed known risk as discussed in the preceding paragraphs. This has proximately caused injury to Plaintiff.

132.    The previously referenced paragraphs demonstrate the the Defendants unlawfully allowed their  coal combustion residuals to unlawfully and annoyingly trespass onto the property of the Plaintiff, This unlawful intrusion constituted an offensive nuisance regarding the Plaintiff's property, and Pursuant to the Tennessee Uniform Residential Disclosure Act obligations, if sale were attempted. This prohibits him from selling his property and creates an unconscionable

stigma upon the residence.

133. This was and is an unwanted unreasonable interference with the Plaintiff's property, proximately causing injury.

134. The Defendants prevented the Plaintiff from assessing dangers to his property, approximately causing injury.

135. As a result of the preceding, the Plaintiff has incurred property damage, reckless infliction of emotional distress, permanent economic damages for interfering with his business relationship with his mortgage lender and health insurance carrier, and all other foreseeable consequences that naturally flow from this outrageous conduct and damages created.

136. In this case, Defendant failed to exercise due care in order to protect individuals performing site remediation once a Site Wide Safety and Health Plan was adopted to protect all on site and the public. In fact they acted contrary to it.

137. Plaintiffs hereby assert their cause of action for Intentional and/or Reckless Failure to Warn , based on the preceding paragraphs.

138. As a direct and proximate result of Defendant's negligent/reckless failure to warn, Plaintiff has suffered personal injury.

139. As a result of the preceding herein described, Plaintiffs hereby assert their cause of action for Reckless Infliction of Emotional Distress.

140. Defendant had a duty of care toward Plaintiffs not to cause them undue emotional distress.

141. Defendant's knowing, wanton, and willful exposure of Plaintiffs to toxins and other hazardous substances breached its duty of care toward Plaintiffs as directed by law, including the Administrative Order from the EPA referenced in the preceding.

142.     As a direct and proximate result of Defendant's negligent infliction of emotional distress upon Plaintiffs, Plaintiffs have suffered damages, the exact amount to be proven at trial.

143.     The Defendants' poisonous substance created an imminent harm to human health, but did not communicate it to the public.

144.     Based upon the preceding paragraphs, Plaintiffs hereby assert their cause of action for Fraud.

145.     The Defendants represented to Plaintiffs that the fly ash did not contain dangerous toxins or other hazardous substances, but it did and they knew it. Therefore they breached their duty.

146.     The Defendants knew that its representation, both public and private, were false and breached this duty.

147.     As a direct and proximate result of thus fraudulent breach of duty committed upon Plaintiff, he has suffered disease, fear of further disease, medical expenses, monitoring costs, pain and suffering, mental anguish, other personal injuries, and other damages, the exact amount to be proven at trial.

148.     Management at Jacobs knowingly and intentionally lied to subcontractors, the public, and Plaintiff regarding the safety of the toxicity of the fly ash. Jacobs Safety Manager, Tom Bock, stated you can "DRINK A GLASS OF FLY ASH PER DAY AND BE HEALTHY" – but it is radioactive and untrue.

149.     Jacobs and TVA misrepresented and concealed from Plaintiffs that the Site did contain toxic constituents or other hazardous substances.

150.     The information known by Jacobs regarding the fly ash toxicity was concealed falsely and Jacobs acted with reckless regard as to whether or not its representation/concealment

was false.

151.    Jacobs failed to use due care and honesty regarding the accuracy of its representations to Plaintiffs and deviated from its own Site Wide Safety and Health Plan and its promises to the ratepayers and Roane County residents, and Plaintiff. This caused injury to Plaintiff due to Jacobs breach of duty.

152.    Jacobs intended to cause Plaintiffs to continue to work on the Site without personal protective equipment, in order to create a false perception of safety.

153.    Jacobs altered air monitoring results to determine the level of radioactivity and metal toxicity in order to deceive the Public. This was also hidden from TDEC and the EPA in order to prevent those agencies frome visiting the Kingston site to actually avoid disclosure of the unsafe nature of the ash and to see it visibly migrating onto Plaintiff's property.

154.    Plaintiffs, in justifiable reliance upon the Defendants' representation that the toxic fly ash was safe, did work on the Site without respirators, masks or personal protective equipment.

155.    As a direct and proximate result of Defendant's fraud upon Plaintiff, has contracted illnesses, fear of disease, medical expenses, monitoring costs, pain and suffering, mental anguish, other personal injuries, property, and other damages, the exact amount to be proven at trial.

156.    ***TVA has attempted to use science to mislead and distract interest from the public due to the fact most people do not want to read things they can not understand. However, the science is not at all complicated. ———TVA's internal documents say fly ash can kill. Duke University and specialists from other respected Institutions ( i.e UTK epidemiologists, ASU, and other world renowned industrial hygienists) say it will kill. Common sense science is that it will kill. TVA and Jacobs can not run from their own documents that say it attacks all organs***

*and kills.*

157.    ***Due to their reckless conduct , People claim they are hurt or have been killed through contact.  Simple science demonstrates that the radioactive coal fired ash injures or kills.***

158.    Mr. Ryan has had routine contact living immediately next to KIF  and has been injured from the radioactive coal fired ash.

159.    Therefore, the Defendants proximately caused the plaintiff's injuries.

160.    Further , the migration of coal ash upon the property of the plaintiff is an intrusive nuisance to his health and property, and further creates a stigma to his real property.

161.    The nuisance to his property can potentially be remediated as to be determined through discovery and ultimately by a jury, as the appropriate arbitrator as to whether a nuisance is temporary, permanent, private, or public.

162.    The recklessness committed by the Defendants tortiously interfered with his business relationships with his health care providers, lenders, and insurance carriers.

163.    The Defendants caused an unwanted trespass upon his property.

164.    By evidence of the preceding, the Defendants have recklessly and/or intentionally interfered with his business relationships with health care providers and insurance carriers, and is entitled to damages from this interference. Moreover, his health care providers and insurance carriers should not have to pay for medical injuries  and damages caused by TVA and Jacobs Engineering.

**Wherefore**, Plaintiffs pray judgment against Defendant as follows:

For fair compensatory damages for physical injury, disease, fatal illness, pain and suffering, mental anguish, medical expenses, medical monitoring costs, property damage, intentional/reckless interference with his health care providers, health Ins. Carriers, mortgage lenders and the like, and all lost wages in any amount fair not to exceed 8.2 Million Dollars ($8,200,000.00). Additionally, Plaintiff prays for a trial and requests the following:

      A.      An Order from this Court requiring the Defendants to release all prior information motion regarding potential health effects as it relates to Coal Ash Exposure (including Radiation and Asbestos)pursuant to the ECPRA and the EPA Administrative Order and the Freedom of Information Act. This prayer for relief includes all PR communications between the Defendants Public Relations and Legal Departments for the last 15 years between TVA, Jacobs, and any other contractor as no privilege exists for 3rd party communications and such is further waived due to Jacobs' pleading of comparative fault against TVA in Kingston litigation involving the same subject matter, because the public has a right to know.

      B.      An Order pursuant to the ECPRA, all other laws and equity requiring the Defendants to disclose all documents that TVA's Fly/Coal Ash (CCR'S) is safe and/or unsafe, and what damage it can do to your immune system and organs of the body.

      C.      An Order requiring Defendants to remediate Plaintiff's Property.

      D.      An Order requiring TVA to cease the migration of its ash onto Plaintiff's property.

      E.      Punitive damages in any amount fair not to exceed $10,000,000.00.

      F.      An Order to make all prayers for relief in paragraphs A,B,and C be required to be submitted as a part of the EPA Administrative Record.

G.      An Order requiring the Defendants to promptly  produce all talking points related to coal ash remediation, coal ash safety, and health hazards related  to fly ash pursuant to the ECPRA.

H.      Produce all numerical actuarial analysis (bean counting) of   financial risk assessments, health assessments, and all analysis, including long term financial assessments related to long term health and liability exposure pursuant to the ECPRA, FOIA, and in the interest of justice.

I.      All communications electronic or otherwise between Jacobs and TVA legal departments between 2012- 2020, as Jacobs nullified any claim of privilege whatsoever by pleading comparative  fault upon TVA in a related case .

J.      When appropriate, the Plaintiff prays that  the Court entertain a motion for mutual/non-mutual offensive and testimonial collateral  estoppel in  related cases that were tried and  jury verdicts have been rendered on the issue of liability.

K.      Plaintiffs reserve the right to amend this Complaint against all parties, as the facts, through discovery, should warrant.

L.      On all Claims for Relief, such other and further relief as this Court deems just and proper under the circumstances, including attorneys fees.


Respectfully submitted this 23rd  day of October, 2021


_____/s/ James K. Scott_____

James K. Scott,
BPR #016893
625 Market Street, 7th Floor
Knoxville, TN  37902

865-254-8739